**In the Matter of COMMERCE CAPITAL CORP., Debtor.**

**Bankruptcy No. 77–B–1633.**

United States Bankruptcy Court, E. D. Wisconsin.

Jan. 9, 1981.

R. Arthur Ludwig, Ludwig & Shlimovitz, Milwaukee, Wis., Atty. for the Trustee.

Sidney Sodos, Jacobson, Sodos, Melnick & Krings, S.C., Milwaukee, Wis., for Commerce Group Corp.

Charles B. Rosenak, Washington, D.C., Atty. for U. S. Small Business Administration.

## DECISION

HOWARD H. HILGENDORF, Bankruptcy Judge.

The limited question for decision is to determine what test should be used to evaluate the assets of the debtor to enable the court to determine whether the plan proposed by the trustee satisfies the requirements of Section 216 of the Bankruptcy Act. Since this case was commenced prior to October 1, 1979 the Bankruptcy Reform Act of 1978 does not apply and the case is

governed by the Bankruptcy Act of 1898 as amended.[1]

The trustee contends that the test which should be used is an appraisal of the physical assets on the basis of an orderly liquidation. The stockholders, consisting only of the parent company, Commerce Group Corp., contend that the test to be used should be the capitalization of the future earnings of the debtor.

The debtor in this case is an SBIC (Small Business Investment Company) engaged in the business of lending or investing funds in financially distressed companies. The principal capital funds used in the business were derived from loans from the Small Business Administration. Consequently the SBA is the largest single creditor having an unsecured claim in excess of 15 million dollars. The SBA is therefore capable of rejecting any plan of reorganization which might be proposed because the SBA claim far exceeds the ⅔ in amount of unsecured claims necessary to accept a plan under Chapter X. The SBA agrees with the trustee that the test which should be used is the liquidation value of the assets.

The principal assets of the debtor consist of real estate holdings of portfolio companies in land located principally in Colorado identified as recreational land. Prior to the filing of this case in 1977, this land was being sold to the public through salesmen employed on a commission basis. After the filing of the case, the court discouraged further promotional activities of this nature because of allegations that misrepresentations were being made to prospective purchasers. Therefore, the principal activities of the trustee during the past three years has been the liquidation of assets in an orderly manner. His last report discloses that he has on hand $1,248,546.23 which is invested in Certificates of Deposit at very favorable interest rates. His report also discloses that he has land contract receivables of approximately 6 million dollars. However, the trustee contends that the debtor is insolvent and for that reason he has proposed a plan of orderly liquidation of the remaining assets consisting largely of the real estate described. Although creditors and other interested parties had an opportunity to propose other plans, none has been filed other than the trustee's plan of liquidation. The largest single creditor, SBA, has been in favor of liquidation since the very inception of the case and has filed a brief in support of the "liquidation" test.

The sole stockholder, Commerce Group Corp., relies heavily upon the decision of the U. S. Supreme Court in the case of *Protective Committee for Independent Stockholders of TMT Trailer Ferry, Inc. v. Anderson, Trustee in Bankruptcy, et al.*, 390 U.S. 414, 88 S.Ct. 1157, 20 L.Ed.2d 1 (1968) and urges the court to require a test of the "future earning capacity" of the debtor. The *Protective Committee* case appears to be a leading case on the subject and the court

---

1. Section 216 of the Bankruptcy Act of 1898, as amended, provides that a plan of reorganization under Chapter X:

(7) shall provide for any class of creditors which is affected by and does not accept the plan by the two-thirds majority in amount required under this chapter, adequate protection for the realization by them of the value of their claims against the property dealt with by the plan and affected by such claims, either as provided in the plan or in the order confirming the plan, (a) by the transfer or sale, or by the retention by the debtor, of such property subject to such claims; or (b) by a sale of such property free of such claims, at not less than a fair upset price, and the transfer of such claims to the proceeds of such sale; or (c) by appraisal and payment in cash of the value of such claims; or (d) by such method as will, under and consistent with the circumstances of the particular case, equitably and fairly provide such protection;

(8) shall provide for any class of stockholders which is affected by the plan and does not accept the plan by the majority of the stock required under this chapter, adequate protection for the realization by them of the value of their equity, if any, in the property of the debtor dealt with by the plan, either as provided in the plan or in the order confirming the plan, (a) by the sale of such property at not less than a fair upset price; or (b) by appraisal and payment in cash of the value of their stock; or (c) by such method as will, under and consistent with the circumstances of the particular case, equitably and fairly provide such protection: Provided, however, That such protection shall not be required if the judge shall determine that the debtor is insolvent.

has carefully examined the lengthy decision. It is true that in the *Protective Committee* case the Supreme Court reversed and remanded the case because the reorganization court did not apply a "future earnings" test in determining the solvency or insolvency of the debtor. If one were to read only the headnotes to the case it might appear that such a test should be required in every case. However, examination of the facts in the case reveal an important distinguishing feature from the case at bar. TMT, the debtor, had been in the business of transporting freight between Florida and Puerto Rico on sea-going barges and loaded truck trailers. Despite its financial difficulties and the filing of a reorganization case, the company "remained in a strong competitive position" and while the case was pending "the fleet of vessels was increased from three to five and the number of truck trailers from 350 to 670." The debtor actually increased its revenues from $3,801,000 in 1962 to $4,779,000 in 1964 while the case was pending in court. As the court pointed out in its opinion at page 446, 88 S.Ct. at page 1174:

> In short, TMT would seem to be a company which has established, preserved, and increased its share of a highly competitive market despite intense competition and major internal crises. It operates in a market undergoing substantial change and is itself faced with the imminent need to re-equip its fleet. In these circumstances an adequate notion of the going-concern value of TMT could be obtained only by looking to the future as well as the past.

Thus, in the *Protective Committee* case the court was dealing with a productive and viable business enterprise and a plan of reorganization which contemplated the continued operation of the business.

In the case at bar we are dealing with a debtor whose principal business was investing or lending money to other business enterprises. However, the debtor ran out of funds and counsel for the SBA has stated categorically that no further funds will be advanced to the debtor. The debtor has not come forward with any other plan of reorganization and the only plan before the court is the trustee's plan of liquidation. Although the trustee has on hand in excess of one million dollars which the debtor contends could be used as capital funds, the SBA points out that the funds on hand would not even be sufficient to pay the interest due on the SBA debt. How can the debtor generate "future earnings" when it has no capital funds to invest or lend and when the net earnings during the past three years have not even been sufficient to pay the interest on its debt to SBA?

In order to apply a "future earnings" test to determine the value of the assets there must be reasonable grounds to believe that the debtor can be reorganized as a productive and viable business. All of the facts before the court in this case indicate that liquidation is the only feasible plan which could be confirmed. As the trustee points out in his brief, the following facts indicate that a liquidation plan is the only viable plan of reorganization:

A. The original Chapter XI Plan filed in these proceedings by the debtor on February 24, 1978, envisioned a Plan of orderly liquidation;

B. The debtor was an SBIC in the business of lending and/or investing funds in financially distressed companies. Its license is still outstanding; however, the SBA has refused to further fund the debtor so its normal business function is cut off without funds to either borrow or invest;

C. The debtor's principal asset (owned by various portfolio companies) is land identified to be recreational. This land is being marketed to the public in various sizes for cash or to be financed through mortgages or land contracts.

D. The debtor is not a going concern in the traditional sense since it is not a manufacturing concern nor the provider of services the nature of which could go on for an indefinite period of time. Once the principal asset of

real estate is sold, the function of the debtor ceases.

E. That Commerce Group Corp.'s recent attempt to register with the SEC a new issue of its stock in an attempt to raise funds to settle the claim with the Small Business Administration also envisions an orderly liquidation of the debtor and its portfolio companies. The proposed prospectus as filed with the SEC shows Commerce Capital Corp. as being insolvent.

It is therefore the conclusion of the court that the test to be used by the court to determine the financial condition of the debtor is the "liquidation value" of the assets based upon a plan of orderly liquidation. The motion of the trustee to determine the solvency of the debtor on this basis is granted.

Although evidence of value at the hearing will be limited to the "liquidation value," the debtor is not foreclosed from offering any relevant evidence at the hearing which would show that the "going concern test" would be appropriate under the circumstances of this case. In other words, the court will not consider evidence of value on a "future earnings" basis at the hearing, but the debtor may make a showing that such test should be applied in this case. If sufficient proof is shown to convince the court that a "future earnings" test is necessary in this case, the court will make adequate provisions for an additional hearing for that purpose.

IT IS SO ORDERED.